IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| ESTES EXPRESS LINES,<br>    Plaintiff, | )<br>)<br>) | |
| v. | ) | Civil No. 3:19-cv-278 (DJN) |
| | ) | |
| WHATMAN HARDWOODS,<br>    Defendant. | )<br>)<br>)<br>) | |

## MEMORANDUM OPINION

Plaintiff Estes Express Lines ("Estes") brings this action against Defendant Whatman Hardwoods ("Whatman") to collect $104,384.29 in unpaid freight charges, plus fees and costs, for shipping services that Estes rendered to Whatman. This matter comes before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on Whatman's Partial Motion to Dismiss for Lack of Personal Jurisdiction and Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss") (ECF No. 8), moving to dismiss those portions of Estes's claims stemming from shipments outside of Virginia for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and those portions of Estes's claims stemming from shipments into Virginia for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). For the reasons set forth below, the Court DENIES Whatman's Motion to Dismiss (ECF No. 8).

### I.   BACKGROUND

When a court addresses the question of personal jurisdiction "on the basis only of motion papers . . . the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). That said, the Court need not

consider only Estes's proof of personal jurisdiction to decide which inferences it will make. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993). Moreover, to the extent that Whatman's Motion to Dismiss challenges the Court's subject matter jurisdiction over the claims stemming from shipments into Virginia, because Whatman challenges the sufficiency of the facts alleged in Estes's Complaint to establish such jurisdiction, the Court will accept such facts as true. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (describing the two types of challenges to subject matter jurisdiction and the presumptions of truthfulness afforded in each). With these principles in mind, the Court accepts the following facts.

### A. Underlying Business and Contractual Relationship

Estes, a Virginia corporation, transports goods via motor carrier and has a principal place of business in Richmond, Virginia. (Compl. (ECF No. 1-1) ¶¶ 1-2.) Whatman, an Ohio corporation, manufactures antique lumber products such as floors, doors and cupboards, and has a principal place of business in Bellville, Ohio. (Compl. ¶ 3; Aff. of Timothy Whatman ("Whatman Aff.") (ECF No. 9-1) ¶¶ 2-3.) During the relevant period, Whatman utilized an on-demand shipment model whereby it would call its contact, Russell Sweetman ("Sweetman") — an employee of the logistical support company, Meridian One Enterprises, Inc. ("Meridian One")[1] — each time it had a product ready for shipment, and Sweetman would arrange for

---

[1] Timothy Whatman attests that at all times he worked with Sweetman, he believed that both Sweetman and Meridian One were located in Maryland. (Whatman Aff. ¶ 6.) However, a search of Virginia's State Corporation Commission ("SCC") business entity registry reveals that Meridian One incorporated in Virginia and has its principal place of business in Alexandria, Virginia. Meridian One Enterprises, Inc., Commonwealth of Va. State Corp. Comm'n (May 10, 2019; 11:25 AM), https://sccefile.scc.virginia.gov/Business/0717121. Although the SCC registry reports Meridian One's corporate status as "terminated," drawing all inferences in favor of Estes for the purposes of Whatman's Motion to Dismiss, and upon further confirmation from Meridian One's corporate website, the Court accepts that Meridian One maintained its principal place of business in Alexandria, Virginia throughout the time in question. *Combs*, 886 F.2d at 676; *see also Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *4 (E.D. Va. Feb. 8, 2012)

shipping services. (Whatman Aff. ¶¶ 4-6.) For a typical shipment, Sweetman obtained quotes from multiple carriers before selecting the carrier with the lowest quoted price, relaying that carrier's information back to Whatman. (Whatman Aff. ¶ 8.) After first engaging Estes in 2016, in August 2017, Whatman began utilizing Estes as a carrier on some shipments. (Compl. ¶¶ 8-9, 15; Whatman Aff. ¶ 7.)

As part of this engagement, in August 2016, Estes issued a Pricing Agreement (the "Agreement") to Whatman. (Compl. ¶ 9; App. A to Compl. ("Agreement") (ECF No. 1-1).) The Agreement provided Whatman with shipping discounts and preferred pricing in return for its patronage. (Compl. ¶ 10.) Relevant here, the Agreement also incorporated by reference and applied to each shipment "the rules set forth in . . . the EXLA 105 Rules Tariff [(the "Rules Tariff")] in effect at time of shipment," but Estes did not attach the Rules Tariff to the Agreement or instruct Whatman on how to find it. (Agreement at 3.) Moreover, Whatman never received a copy of the Agreement or the Rules Tariff. (Whatman Aff. ¶ 11.) That said, Estes posted the Rules Tariff on its website. (Aff. of Albert D. Wilder, Jr. ("Wilder Aff.") (ECF No. 19-1) ¶ 9.) The Rules Tariff provided, in relevant part, that:

> [a]ll bills of lading, pricing agreements, rate agreements, and spot quotes shall be governed by and construed in accordance with the substantive law of the Commonwealth of Virginia without regard to its choice of law principles, or where applicable, federal law. Any court of competent jurisdiction within the Commonwealth of Virginia shall have personal jurisdiction over the shipper, consignor, consignee, bill to party, and beneficial owner in any dispute which might arise under this rules tariff, in addition to any other venue as provided by law.

---

("Information that 'is readily accessible through the State Corporation Commission's website' is a matter of public record, of which the Court may take judicial notice [to resolve a motion to dismiss]." (quoting *Wynne v. Birach*, 2009 WL 3672119, at *1 n.3 (E.D. Va. Nov. 3, 2009))); Meridian One, Meridian One (May 10, 2019, 12:01 PM), https://www.meridianone.com/ (showing same business address in Alexandria, Virginia as SCC registry).

3

(Ex. IV to Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Rules Tariff") (ECF No. 19-5) at 5, Item 105.)

For each Estes shipment, Whatman received a draft bill of lading,[2] prepared by Sweetman, which stated that Estes received each shipment for delivery "subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise the rates, classifications and rules (Estes Express Lines 105 series) that have been established by the carrier and are available to the shipper, on request." (*See, e.g.*, App. B to Compl. ("Sample BOL") (ECF No. 1-1); *see also* Whatman Aff. ¶ 9.)[3] Each bill of lading also included the address of Estes's Virginia headquarters and stated in the title that the bill was not negotiable and constituted a "short-form" bill of lading, meaning the bill did not expressly contain all of the terms governing the transportation contract but incorporated additional terms by reference to another document. (Sample BOL); *Bill of Lading*, Black's Law Dictionary (14th ed. 2014). Whatman's co-owner, Timothy Whatman, approved each draft bill of lading and presented it to an Estes driver after Estes loaded the items listed on the bill. (Whatman Aff. ¶¶ 2, 9-10.) The Estes driver signed each bill, and each company kept a copy. (Whatman Aff. ¶ 10.) Although the bills of lading stated that Estes would provide the Rules Tariff to Whatman upon request, Estes did not attach the Rules Tariff to each bill. (Sample BOL.) Neither did each bill of lading refer to the Agreement. (Sample BOL.)

---

[2] A bill of lading acknowledges "the receipt of goods by a carrier or by the shipper's agent and [constitutes] the contract for the transportation of those goods." *Bill of Lading*, Black's Law Dictionary (14th ed. 2014). Bills of lading generally fall into two categories: long-form bills of lading that expressly contain all the terms of the transportation contract and short-form bills of lading that do not expressly contain all the terms of the transportation contract but incorporate them by reference to another document. *Id.*

[3] For a clearer copy of a representative bill of lading between the parties, see Exhibit E to Whatman's Memorandum in Support of its Motion to Dismiss (ECF No. 9-5).

4

In total, Estes transported and delivered 269 shipments for Whatman to forty-two different states, including ten shipments to Virginia and several shipments that would have passed through Estes's Virginia terminal. (Wilder Aff. ¶¶ 6-7.) Throughout the parties' relationship, Whatman also filed eleven freight loss and damage claims totaling $30,337.69, which Estes handled from its Richmond, Virginia headquarters. (Wilder Aff. ¶ 10.)

**B.  Disputed Shipments**

At issue in this suit, between August 2017 and March 2018, Estes delivered seventy-four shipments on Whatman's behalf (the "disputed shipments"). (Compl. ¶ 17.) For each of the disputed shipments, Whatman and Estes executed a bill of lading as described above, listing Estes as the carrier and Whatman as the shipper. (Compl. ¶¶ 18-19.) Estes also invoiced Whatman for the cost of each disputed shipment, and Whatman accepted each invoice without objection. (Compl. ¶ 22; App. B to Compl. ("Sample Invoice") (ECF No. 1-1).) Each invoice included Estes's post office box address in Richmond, Virginia, and specified any discounts given pursuant to the Agreement, though the invoices did not name the Agreement as the source of the discounts. (Sample Invoice.)

To date, Whatman has not paid the invoiced amounts, which totaled $23,150.65 after including the discounts provided for in the Agreement. (Compl. ¶ 23.) Because Whatman failed to pay the discounted invoices within thirty calendar days, citing to Item 720 of the Rules Tariff, Estes removed all discounts, leaving an undiscounted total of $104,384.29 in unpaid charges. (Compl. ¶¶ 26-27; App. D to Compl. ("Past Due Warning") (ECF No. 1-1) at 1.) Further citing to Item 720 of the Rules Tariff, Estes claimed entitlement to a 30 percent collection fee on each undiscounted invoice. (Compl. ¶ 28; Past Due Warning at 1.)

On February 25, 2019, Estes filed suit in the Circuit Court for the City of Richmond, and, on April 12, 2019, Whatman removed Estes's suit to this Court. (Notice of Removal (ECF No. 1).) On April 26, 2019, Whatman filed its Motion to Dismiss, moving to dismiss those portions of Estes's claims stemming from shipments outside of Virginia for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and those portions of Estes's claims stemming from shipments into Virginia for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). (Mot. to Dismiss (ECF No. 8).) On May 8, 2019, Estes filed its Memorandum in Opposition to Whatman's Motion to Dismiss, (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Mem.") (ECF No. 19)), and, on May 14, 2019, Whatman filed its Reply, (Def.'s Reply to Pl.'s Opp. to Def.'s Mot. to Dismiss ("Def.'s Reply") (ECF No. 21)), rendering the matter now ripe for review.

## II. STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either, as here, attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

Federal Rule of Civil Procedure 12(b)(2), on the other hand, permits a defendant to challenge a court's personal jurisdiction over it. Fed. R. Civ. P. 12(b)(2). "[W]hen, as here, the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge."[4] *Combs*, 886 F.2d at 676. In deciding whether a plaintiff has made a prima facie showing of personal jurisdiction based only on the papers presented, a court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* However, "a plaintiff cannot rest on [the allegations in its complaint] in the face of specific contradictions contained in [the] defendant's motion and support[ing] affidavits." *In re Arthur Treacher's Franchisee Litig.*, 92 F.R.D. 398, 410 n.11 (E.D. Pa. 1981).

Determinations of personal jurisdiction require a two-step inquiry. First, a court must find that the long-arm statute of the forum state authorizes jurisdiction over the defendant. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). Then, the court must find that the exercise of personal jurisdiction over the defendant accords with the constitutional requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, "the statutory

---

[4] Neither Whatman nor Estes requested an evidentiary hearing, or that the Court wait to receive evidence of personal jurisdiction at trial. (*See* Mot. to Dismiss at 1 ("In support of this motion, Whatman relies on the accompanying Memorandum and exhibits thereto"); Pl.'s Mem. at 12 (asking the Court to deny Whatman's Motion to Dismiss to "allow this case to proceed" and not requesting a hearing or for the Court to wait until trial).) Moreover, the Court finds that a hearing will not materially aid in the decisional process. Thus, the Court will decide Whatman's Motion to Dismiss using Estes's Complaint and the parties' pleadings, including the exhibits and appendices attached thereto.

inquiry necessarily merges with the constitutional inquiry, and the two inquiries become one." *Stover v. O'Connell Assocs.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). Thus, if a Virginia court has personal jurisdiction over a defendant under the Due Process Clause, the court has personal jurisdiction under Virginia's long-arm statute. *Id.*

The Due Process Clause requires that a defendant "have certain minimum contacts with [the forum] such that the maintenance of a suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Within those parameters, a court may find that it has either general or specific personal jurisdiction over a defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). General personal jurisdiction exists over defendants with "continuous and systematic contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). Otherwise, a court may exercise only specific personal jurisdiction if a defendant's minimum contacts with the forum state form the basis for the claims in question. *Mitrano*, 377 F.3d at 407. With respect to specific personal jurisdiction, the Fourth Circuit has established a three-part test, requiring trial courts to consider: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

Moreover, because personal jurisdiction constitutes an individual right, a party may waive that right and submit to the personal jurisdiction of a court by appearance or by providing

express or implied consent in "[a] variety of legal arrangements." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982). Indeed, the Fourth Circuit has found that "a valid forum selection clause . . . may act as a waiver to objections to personal jurisdiction." *Consulting Eng'rs Corp.*, 561 F.3d at 281 n.11 (emphasis removed).

### III. ANALYSIS

Because Whatman's subject matter jurisdiction argument relies on the Court dismissing for lack of personal jurisdiction those portions of Estes's claims stemming from shipments outside of Virginia (the "non-Virginia claims"), the Court will first consider whether it lacks personal jurisdiction over Whatman for the non-Virginia claims. (*See* Mem. in Supp. of Whatman Hardwood's Mot. to Dismiss ("Def.'s Mem.") (ECF No. 9) at 11 (arguing that those portions of Estes's claims relating to the Virginia shipments (the "Virginia claims"), without the non-Virginia claims, present insufficient damages to meet the threshold for diversity jurisdiction under 28 U.S.C. § 1332).) Only if the Court lacks personal jurisdiction over Whatman for the non-Virginia claims will Whatman's subject matter jurisdiction arguments succeed, meaning, in effect, that Whatman's personal jurisdiction argument resolves its entire Motion to Dismiss.

**A. Whatman Waived Its Right to Challenge the Personal Jurisdiction of this Court by Approving Bills of Lading for Each Shipment that Incorporated the Rules Tariff and Its Forum Selection Clause.**

As the principal argument in support of its Motion to Dismiss, Whatman contends that the forum selection clause within the Rules Tariff, which submits Whatman to the jurisdiction of Virginia's courts, should not apply to it, because Estes never provided a copy of the Rules Tariff to Whatman, and Whatman never saw or otherwise had awareness of the forum selection clause. (Def.'s Mem. at 1-2, 5-8.) Whatman argues that it lacked sufficient notice of the forum selection

clause such that application of the clause to it would be unreasonable and unjust. (Def.'s Mem. at 5-8.)

Estes responds that Whatman had more than sufficient notice of the Rules Tariff through the 269 shipments Whatman tendered to Estes, for which Whatman approved and executed 269 bills of lading incorporating the Rules Tariff. (Pl.'s Mem. at 9-12.) Estes argues that the realities of the shipping industry render impractical printing all of the terms for each shipment, which is why Estes provided the Rules Tariff on request and on its website, not with every bill of lading. (Pl.'s Mem. at 10.) Estes maintains that Whatman had considerable experience dealing with interstate carriers; therefore, the Court should not excuse Whatman's ignorance of the forum selection clause. (Pl.'s Mem. at 10.) And Estes adds that Whatman likewise cannot claim ignorance of the Agreement, because each invoice clearly displayed discounts that Whatman received through the Agreement. (Pl.'s Mem. at 10.)

As mentioned, the Fourth Circuit has found that "a valid forum selection clause . . . may act as a waiver to objections to personal jurisdiction." *Consulting Eng'rs Corp.*, 561 F.3d at 281 n.11 (emphasis removed). Forum selection clauses enjoy a strong presumption of validity unless courts deem them unjust, unreasonable or invalid for reasons such as fraud or overreaching. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). This heavy burden falls on the resisting party. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991). To prove the unreasonableness of an agreed-upon forum, the resisting party must show that: (1) a party induced agreement to the clause by fraud or overreaching; (2) the resisting party would be "deprived of his day in court because of the grave inconvenience or unfairness of the selected forum;" (3) the chosen law would "deprive plaintiff of a remedy;" or, (4) enforcement of the clause would "contravene a strong public policy of the forum." *Allen v. Lloyd's of London*, 94

F.3d 923, 928 (4th Cir. 1996) (internal citations and quotations omitted). Moreover, "[t]he legal effect of a forum selection clause depends in the first instance [on] whether its existence was reasonably communicated to the [party against whom enforcement is sought]." *Star Techs., LLC v. Gillig LLC*, 2012 WL 5194072, at *3 (S.D. W. Va. Oct. 19, 2012) (citing *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995); *Electroplated Metal Sols., Inc. v. Am. Servs., Inc.*, 500 F. Supp. 2d 974, 976 (N.D. Ill. 2007)); *see also Carnival Cruise Lines*, 499 U.S. at 595 (considering, among other factors, whether the respondents received notice of the forum selection clause).

Here, relying primarily on *Star Technologies*, Whatman contends that it received insufficient notice of the forum selection clause in the Rules Tariff and thus enforcement of the clause against it would be unreasonable and unjust. (Def.'s Mem. at 5-8.) In *Star Technologies*, the defendant, Gillig LLC, moved to transfer Star Technologies' claims to the Northern District of California pursuant to a forum selection clause. *Star Techs., LLC*, 2012 WL 5194072, at *1. Gillig LLC faxed a purchase order to Star Technologies for cushion clamps. *Id.* The faxed purchase order referenced a "confirming purchase order," which Gillig LLC signed and mailed to Star Technologies and which contained a forum selection clause selecting Alameda County, California as the exclusive forum for any disputes arising out of the purchase order. *Id.* at *1, 3. Before receiving the confirming purchase order, Star Technologies fulfilled the faxed purchase order, which Gillig LLC rejected, resulting in the lawsuit. *Id.* at *1. Because Gillig LLC did not receive notice that the Postal Service could not deliver the confirming purchase order, and because the faxed purchase order generally incorporated by reference the terms of the confirming purchase order, Gillig LLC argued that Star Technologies had sufficient notice of the terms of the confirming purchase order, including the forum selection clause. *Id.* at *3.

11

Rejecting Gillig LLC's arguments, the Southern District of West Virginia found no evidence that Star Technologies ever received the confirming purchase order, and the court noted that Star Technologies never returned a signed copy of the order. *Id.* Indeed, Gillig LLC did not require a signed confirmation of the confirming purchase order and therefore could not establish Star Technologies' assent to its terms. *Id.* And the court found evidence to rebut the presumption that Star Technologies received the confirming purchase order in the mail. *Id.* The court further found that Gillig LLC had not communicated the existence of the forum selection clause by other means, holding that the small-print language in the faxed purchase order referencing the confirming purchase order, although discussing "terms and conditions" generally, failed to "draw[] attention to the fact that a forum selection clause [was] one of those terms and conditions." *Id.* at *4. Because Gillig LLC failed to provide sufficient notice to Star Technologies of the forum selection clause, and because Gillig LLC otherwise failed to establish that the Northern District of California constituted a preferred forum, the Southern District of West Virginia denied Gillig LLC's motion to transfer. *Id.*

Whatman argues that *Star Technologies* "applies with equal force to the present case." (Def.'s Mem. at 7.) Whatman points out that the Agreement purporting to bind Whatman to the terms of the Rules Tariff, like the confirming purchase order in *Star Technologies*, bears no signature by a Whatman representative and otherwise contains no indicia that Whatman knew of its terms. (Def.'s Mem. at 7.) Whatman also notes that the Agreement and bills of lading referred only generally to the Rules Tariff and did not specifically warn Whatman that it might be bound by a forum selection clause, which proves analogous to the generalized, small-print incorporation at issue in *Star Technologies*. (Def.'s Mem. at 8.) And Whatman contends that the bills of lading only selectively incorporated the "rates, classifications and rules" of the Rules

12

Tariff, which, compared with Estes's later incorporation of the entirety of the Uniform Bill of Lading, undermines Estes's contention that the entire Rules Tariff applied to each shipment. (Def.'s Mem. at 8; Sample BOL.)

Despite Whatman's arguments, the Court finds *Star Technologies* distinguishable from this case. For one, unlike the parties in *Star Technologies*, the parties here had an extensive business relationship involving the repeated use of the same contractual terms. *See Star Techs.*, 2012 WL 5194072, at *1 (explaining that Gillig LLC faxed the initial purchase order following "preliminary discussions for [Gillig LLC] to purchase clamps from [Star Technologies]"). Indeed, Whatman tendered 269 shipments to Estes during their business relationship. (Wilder Aff. ¶ 6.) For each of these shipments, Whatman — not Estes — approved and executed a bill of lading, providing each bill to an Estes driver for Estes's approval.[5] (Whatman Aff. ¶¶ 9-10.) Whatman then retained its own copy of each bill. (Whatman Aff. ¶ 10.) Each bill of lading explicitly stated in the title that the bill was not negotiable and constituted a short-form bill of lading, meaning that each bill did not include all of the terms governing each shipment and instead incorporated additional terms by reference. (Sample BOL); *Bill of Lading*, Black's Law Dictionary (14th ed. 2014). Each bill of lading also incorporated the "rates, classifications and rules" of the Rules Tariff and stated that Whatman could receive a copy of the Rules Tariff on request. (Sample BOL.) Although Whatman argues that the option to receive the Rules Tariff on request constituted insufficient notice of the Rules Tariff's terms, Whatman does not suggest that it ever requested the Rules Tariff despite its incorporation by reference into 269 separate

---

[5] Although Whatman did not sign each bill of lading, it became bound by the terms of each bill by delivering the items listed on each bill to Estes for shipment. *See* 13 Am. Jur. 2d <u>Carriers</u> § 310 (2019) ("A bill of lading as ordinarily issued is signed by the carrier only and it need not be signed by the shipper. Its terms and conditions are binding even though the bill is unsigned by the shipper . . ." (internal citations omitted)); (Sample BOL.)

13

bills of lading and despite Estes affirmation that it would promptly send the Rules Tariff to all customers who requested it. (Wilder Aff. ¶ 9.)

Moreover, the type of relationship that existed between Whatman and Estes — that of a shipper and carrier of goods — involved customary and judicially recognized practices that prove distinguishable from the purchaser-manufacturer relationship at issue in *Star Technologies*. Indeed, as the Fourth Circuit has recognized, "[c]arriers customarily utilize short form bills of lading as convenient working documents, while reserving for the more cumbersome long forms most of the substantial terms of the shipping agreement." *Cincinnati Milacron, Ltd. v. M/V Am. Legend*, 784 F.2d 1161, 1166 (4th Cir. 1986) (Phillips, J., dissenting) (citing *Commonwealth Petrochems., Inc. v. S/S Puerto Rico*, 607 F.2d 322, 327 (4th Cir. 1979)), *dissent adopted en banc*, 804 F.2d 837 (4th Cir. 1986). Additionally, courts have found that incorporation by reference of long-form bills of lading or rules tariffs provides sufficient notice of incorporated additional terms even when a shipper lacked actual possession of the terms, so long as the shipper could readily access those terms. *See, e.g., Royal Ins. Co. v. Sea-Land Serv., Inc.*, 50 F.3d 723, 727 (9th Cir. 1995) ("This circuit has held that actual possession of the bill of lading with the $500 liability limit is not required before a party with an economic interest in the shipped goods can be held to the limitation." (citing *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 900 (9th Cir. 1989)); *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 704 (11th Cir. 1986) ("[W]e are not prepared to strike down all tariff provisions of which a shipper has no actual notice. Such a result would quickly force carriers to enlarge the bills of lading issued to shippers into mammoth documents containing paragraph upon paragraph of unreadable fine print . . . [that] shippers would be no more inclined to read . . . than they are currently inclined to seek out and read long form bills of lading."); *Berkshire Knitting Mills v.*

*Moore-McCormack Lines, Inc.*, 265 F. Supp. 846, 848 (S.D.N.Y. 1965) (holding that the terms of the long-form bill of lading "became part of the understanding between the parties upon issuance of the dock receipt . . . [even] though no [long-form bill of lading] at all was issued by the carrier"); *Syndor & Hundley, Inc. v. Wilson Trucking Corp.*, 194 S.E.2d 733, 736-37 (Va. 1973) ("[E]ven if the bill of lading were never delivered to Syndor, the bill of lading form containing the nine-month notice requirement, when published with tariff schedules filed with the State Corporation Commission, became a part of the contract of carriage . . ."); *see also Wuerttembergische v. M/V Stuttgart Express*, 711 F.2d 621, 622 (5th Cir. 1983) ("[T]he published tariff of the carrier is law and is controlling."). Only when a "provision[] included in the long form [bill of lading or, in this case, rules tariff] . . . [is] such that the shipper could not be expected to have anticipated its existence" will a court decline to enforce the provision. *Commonwealth Petrochems.*, 607 F.2d at 327 (citing *Encyc. Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7 (2d Cir. 1969); *Caribbean Produce Exch., Inc. v. Sea Land Serv., Inc.*, 415 F. Supp. 88 (D.P.R. 1976)). "Forum selection clauses are not uncommon in a [long-form] bill of lading." *Allianz Ins. Co. of Canada v. Cho Yang Shipping Co., Ltd.*, 131 F. Supp. 2d 787, 793 (E.D. Va. 2000); *see also* 14D Fed. Prac. & Proc. Juris. § 3803.1 (4th ed. 2019) ("[Forum selection clauses] are nearly ubiquitous in all manner of contracts, including wholly domestic contracts of adhesion . . ."). Thus, a short-form bill of lading that incorporates a forum selection clause by referencing a long-form bill of lading or tariff including such a clause provides sufficient notice to a shipper of the clause when the long-form bill of lading or tariff proves readily accessible.

Seeing no reason that these holdings should not apply to this case, the Court finds that the 269 short-form bills of lading issued for each Estes shipment provided sufficient notice to

15

Whatman that it would be bound by rules not included in the bills but incorporated by reference on the face of each bill, including the Rules Tariff and its forum selection clause. Whatman could readily discover the terms applicable to each shipment by requesting the Rules Tariff from Estes, and the Court will not excuse Whatman's failure to investigate and fully understand those terms, especially considering that Whatman sold goods and shipped them in interstate commerce as its primary source of revenue. (*See* Whatman Aff. ¶¶ 4 (affirming that Whatman does not maintain an inventory and instead utilizes on-demand shipment of its custom-made products), 5 (affirming that Whatman joined the Building Industry Association of North Central Ohio, in part, because it helped arrange shipping services), 7 (affirming that, in addition to Estes, Whatman has shipped products with Yellow Freight, Federal Express and UPS Ground).)

Whatman's argument that the bills of lading only partially incorporated the Rules Tariff also rings hollow. (Def.'s Mem. at 8.) The bills of lading incorporated the "rates, classifications and *rules*" of the Rules Tariff, which proves sufficiently broad to encompass the forum selection clause. (Sample BOL (emphasis added); Ex. E to Def.'s Mem (emphasis added).) The Rules Tariff on the front page also described its contents as the "RULES AND REGULATIONS" governing North American shipments. And, although Whatman argues that Estes labeled the forum selection clause an "Item," not a "rate," "classification" or "rule," the Court notes that Estes used the "Item" label merely for organizational purposes and throughout the Rules Tariff refers to items as "rules" and "regulations." (Rules Tariff; Def.'s Reply at 5.) Thus, the Court will not accept Whatman's invitation to engage in semantic technicalities.

Whatman's contention that the bills of lading confused it by referring to the Rules Tariff using ambiguous and inconsistent labels likewise proves unpersuasive. (Def.'s Reply at 4-5.) Although the bills of lading in effect during the relevant period referred to the Rules Tariff as the

16

"Estes Express Lines 105 series," (Sample BOL; Ex. E to Def.'s Mem.), Whatman nonetheless had notice that another document existed with additional terms applicable to each shipment. Each bill also informed Whatman that it could request the document, so Whatman could cure any confusion over the nomenclature assigned to the Rules Tariff by requesting a copy of the document referenced in each bill of lading. And Whatman qualifies as an experienced shipper, whose ignorance of standard industry practices this Court cannot easily excuse. Accordingly, regardless of whether Whatman ever received or had awareness of the Agreement, the 269 Estes bills of lading that Whatman itself admits to approving provided more than sufficient notice to Whatman that it would be bound by the Rules Tariff, including its forum selection clause.

Neither does the forum selection clause in the Rules Tariff qualify as unreasonable or unjust for any other reason. *See Allen*, 94 F.3d at 928 (listing reasons why a forum selection clause might qualify as unreasonable or unjust). Whatman does not contend that Estes induced it to agree to the forum selection clause by fraud or overreaching. In fact, through an agent, Whatman chose Estes as the carrier for the disputed shipments and completed and approved each bill of lading before asking Estes to assent to its terms, including those terms incorporated by reference. (Whatman Aff. ¶¶ 8-10); *see also Swift Textiles, Inc.*, 799 F.2d at 704 (enforcing statute of limitations incorporated by reference into short-form bill of lading, in part, because shipper's agent prepared the bill of lading). Nor does the forum selection clause in question limit Estes's liability or prevent Whatman from suing Estes in Ohio. Rather, the clause merely permits Estes to defend its rights under the Rules Tariff in its home state of Virginia. (*See* Rules Tariff at 5, Item 105 (providing that any Virginia court of competent jurisdiction "shall have personal jurisdiction over the shipper . . . in addition to any other venue as provided by law")); *see also S & D Coffee, Inc. v. GEI Autowrappers*, 995 F. Supp. 607, 609 (M.D.N.C. 1997)

(noting that permissive forum selection clauses in effect waive any objection to personal jurisdiction in the enumerated venue). Whatman also has not argued that the Court's exercise of jurisdiction would effectively deprive it of its day in court. Whatman engages in an extensive interstate business, including in Virginia, and utilized the services of Estes — a Virginia corporation with its headquarters in Richmond — to transport the disputed shipments. (Compl. ¶ 1.) Moreover, Whatman's headquarters in Ohio does not fall so far afield as to render this Court a gravely inconvenient forum. (Wilder Aff. ¶ 6; Whatman Aff. ¶ 4.) And Whatman has not suggested that this Court's exercise of jurisdiction over it would contravene a strong public policy. To the contrary, enforcement of the terms of the parties' agreements furthers the public interest by favoring freedom of contract. *See M/S Bremen*, 407 U.S. at 9-12 (holding that enforcement of forum selection clauses "accords with ancient concepts of freedom of contract").

Because the Court finds that the forum selection clause within the Rules Tariff does not qualify as unjust, unreasonable or invalid, and because Whatman had sufficient notice of the clause, the Court finds that Whatman submitted to the personal jurisdiction of this Court when it approved the bills of lading governing the disputed shipments and thereby agreed to the terms of the Rules Tariff, including the provision providing that "[a]ny court of competent jurisdiction in the Commonwealth of Virginia shall have personal jurisdiction over [Whatman]." (Rules Tariff at 5, Item 105.) Whatman's Motion to Dismiss the non-Virginia claims for lack of personal jurisdiction must therefore fail.

### B. Whatman's Subject Matter Jurisdiction Challenge Must Also Fail, Because the Court Has Personal Jurisdiction Over Whatman for the Non-Virginia Claims, Bringing the Amount in Controversy Above the Necessary Threshold.

As mentioned, Whatman's challenge to the Court's subject matter jurisdiction over Estes's Virginia claims necessarily requires that the Court find that it lacks personal jurisdiction

over Whatman for the non-Virginia claims. (Def.'s Mem. at 11.) Specifically, Whatman argues that the amount in controversy for the Virginia claims equals $2,257.40, which falls far below the threshold of more than $75,000.00 for diversity jurisdiction cases. (Def.'s Mem. at 11 (citing 28 U.S.C. § 1332).) However, because the Court has personal jurisdiction over Whatman for the non-Virginia claims, the amount in controversy remains at least $104,384.29. (Compl. at 5-6.) Because Estes — a Virginia corporation with its principal place of business in Virginia — and Whatman — an Ohio corporation with its principal place of business in Ohio — represent completely diverse parties and the amount in controversy exceeds $75,000.00, the Court finds that it has subject matter jurisdiction over this matter. 28 U.S.C. § 1332; (Compl. ¶¶ 1, 3.) Accordingly, Whatman's Motion to Dismiss for lack of subject matter jurisdiction must also fail.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Whatman's Motion to Dismiss (ECF No. 8). An appropriate Order shall issue.

Let the Clerk forward a copy of this Memorandum Opinion to all counsel of record.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: May 28, 2019